UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

DERMORIS KIDD                                    CIVIL ACTION

VERSUS                                              NO. 16-71

CANDY FLEET, LLC                          SECTION "R" (3)

## ORDER AND REASONS

Before the Court is defendant Candy Fleet, LLC's motion for summary judgment on the issue of maintenance and cure. Because the Court finds that defendant has established its defense under *McCorpen v. Cent. Gulf S.S. Corp.*, 396 F.2d 547 (5th Cir. 1968), the Court GRANTS defendant's motion.

## I.    BACKGROUND

### A. Injury

Plaintiff Dermoris Kidd began working as a deckhand for defendant Candy Fleet, LLC in March, 2014.[1]  On November 1, 2014 Kidd was working aboard one of Candy Fleet's vessels, the M/V CANDY STRIPE, under Captain Josiah Boudreaux.[2]   Boudreaux assigned Kidd the task of cleaning the

---

[1]     R. Doc. 23-1 at 5.
[2]     *Id.* at 1.

CANDY STRIPE's engine room using Aluma Brite, a cleaning solvent.[3] Boudreaux helped clean the engine room for a period of time, and then left Kidd, who continued cleaning on his own.[4] After several hours in the engine room, Kidd reported to Boudreaux that he felt ill.[5]

The following day, Kidd visited Urgent Care of Morgan City in Morgan City, Louisiana.[6] A doctor at Urgent Care diagnosed Kidd with (1) "Respiratory Conditions due to Fumes and Vapors," (2) Asthma, and (3) Asthma with "Acute Exacerbation."[7] Following treatment, Kidd was cleared to "return to work with no restrictions."[8]

On February 19, 2015, approximately three months after the Aluma Brite incident, Kidd was working on the M/V CANDY MACHINE, another Candy Fleet vessel.[9] Kidd alleges that, shortly after accidentally inhaling diesel fumes produced by the vessel's engine, he was instructed to pull a rope.[10] According to Kidd, he began pulling the rope, but quickly felt weak and unable to breathe.[11] The following day, Kidd was treated at Teche

---

[3]    *Id.* at 2.
[4]    *Id.*
[5]    *Id.* at 3.
[6]    *Id.*; R. Doc. 19-5 at 21.
[7]    R. Doc. 19-5 at 22.
[8]    *Id.* at 23.
[9]    R. Doc. 23-1 at 3.
[10]   R. Doc. 23-4 at 50.
[11]   *Id.*

Regional Medical Center, diagnosed with bronchospasm and bronchitis, and prescribed albuterol, prednisone, and zithromax.[12]  Two days later, Kidd was admitted as a patient at the Emergency Department of Providence Hospital in Mobile, Alabama.[13]  Kidd was diagnosed with Asthma and Expiratory Wheezing, and advised to continue taking albuterol and zithromax.[14]

Following his treatment at Teche Regional and Providence, Candy Fleet referred Kidd to Dr. William Schulte, a pulmonologist.[15]  In his initial report, Dr. Schulte stated:

> I am not sure what is going on, whether he has asthma or not. The inhalation injury does not sound severe enough to have caused this problem. I cannot explain the difficulty with the rope this far out from the inhalation injury without problems in between. The nocturnal coughing could be asthma. I have told him I am not sure whether he has reflux or asthma or both.[16]

On May 6, 2015, Dr. Schulte stated that he felt Kidd had achieved maximum medical improvement and did not need any further treatment.[17]

Sometime after receiving this diagnosis from Dr. Schulte, Kidd visited Dr. John Hamilton, a practitioner in the field of occupational medicine.[18]

---

[12]     R. Doc. 19-5 at 29.
[13]     R. Doc. 19-7 at 20-25
[14]     *Id.* at 21-22.
[15]     R. Doc. 23-1 at 4.
[16]     R. Doc. 19-6 at 8.
[17]     *Id.* at 23.
[18]     R. Doc. 23-3 at 2.

Dr. Hamilton disagreed with Schulte's diagnoses, and instead diagnosed Kidd with reactive airway dysfunction syndrome (RADS), a form of chronic asthma caused by Kidd's exposure to Aluma Brite.[19]

On January 7, 2016, Kidd filed this suit.[20] In his Jones Act complaint, Kidd alleges negligence, unseaworthiness, wrongful denial of maintenance and cure, and wrongful termination.[21] Kidd seeks damages for bodily injury and disfigurement, pain and suffering, and medical expenses.[22]

## B. Kidd's Medical History

Before being hired by Candy Fleet, Kidd filled out a job application form and a medical questionnaire.[23]  In response to questions on the application form, Kidd stated that he had completed the twelfth grade, had graduated from high school, and had never received worker's compensation benefits.[24]  These statements were false.[25]  In fact, Kidd left school after completing the ninth grade, and received workers compensation benefits after suffering a back injury at an earlier job.[26]

---

[19]    *Id.* at 4,8.
[20]    R. Doc. 2.
[21]    *Id.* at 4-5.
[22]    *Id.* at 6.
[23]    R. Doc. 23-1 at 6; R. Doc. 19-4 at 1,2.
[24]    R. Doc. 23-1 at 6; R. Doc. 19-4 at 1,2.
[25]    R. Doc. 23-1 at 6
[26]    *Id.*; R. Doc. 23-4 at 22.

4

On his medical questionnaire, Kidd was asked whether he had "ever had injury or disease" to his chest or lungs.[27]  He was also asked whether he had ever had or experienced "respiratory diseases" or bronchitis.[28]  Finally, Kidd was asked whether he had "ever sustained any type of disability, injury, or disease," "ever had or experienced any other injuries or diseases not discussed above," or "ever been a patient in a hospital."[29]  Kidd answered "no" to all of these questions.[30]  The parties dispute whether these answers were truthful.

In support of its contention that Kidd withheld medical information, Candy Fleet points to Kidd's medical records from doctors visits in 2009, 2010, and 2015.  In 2009, Kidd was treated at the Emergency Department of Providence Hospital.[31]   According to the associated records, Kidd complained of a cough, a sore throat, and chest pain.[32]  Kidd rated his pain as a five on a one-to-ten scale.[33]  Under "clinical impression" the treating

---

[27]    R. Doc. 19-4 at 3.
[28]    *Id.*
[29]    *Id.* at 4-5
[30]    *Id.* at 3-5.
[31]    R. Doc. 19-7 at 16-19.
[32]    *Id.* at 19.
[33]    *Id.*

physician wrote "URI," which the parties agree indicates a diagnosis of Upper Respiratory Infection.[34]

Medical records from Springhill Medical Center, another Mobile hospital, show that in 2010 Kidd presented at the Emergency Room with "moderate severe [sic] intermittent shortness of breath beginning several days prior to arrival."[35] The doctor noted that Kidd's condition was "aggravated by anxiety."[36] The records further state that Kidd's "chief complaint" was "difficulty breathing" and that Kidd "state[d] he has [sic] trouble with this for the past couple years."[37] A doctor at Springhill Medical diagnosed Kidd with dyspnea,[38] and prescribed lorazepam for anxiety.[39]

Finally, Candy Fleet calls attention to records from Kidd's post-incident visit to Providence Hospital on February 22, 2015. The "clinician history" section of the Emergency Department records for this visit state that Kidd "has a prior history of asthma," "[h]ad asthma as a child but 'outgrew'

---

[34]     *Id.* at 18.
[35]     *Id.* at 1.
[36]     *Id.*
[37]     *Id.* at 4.
[38]     "Shortness of breath, a subjective difficulty or distress in breathing, usually associated with disease of the heart or lungs; occurs normally during intense physical exertion or at high altitude." Stedman's Medical Dictionary 274360 (Nov. 2014).
[39]     R. Doc. 19-7 at 3.

it," and "presents with a history of mild shortness of breath at rest."[40]  The records further suggest that, upon discharge, Kidd received "Easy- to- Read" discharge instructions explaining asthma and its care.[41]

Kidd denies that these medical records demonstrate that he falsified his medical questionnaire.  Kidd describes the 2009 illness as "like the common cold" and the 2010 illness as "an episode of shortness of breath associated with holiday anxiety."[42]  Kidd further denies ever being diagnosed with asthma prior to the Aluma Brite incident and maintains that any notation in his records of childhood asthma are a mistake.[43]

Candy Fleet now moves to dismiss Kidd's claims for wrongful denial of maintenance and cure.[44]  Candy Fleet argues that Kidd intentionally withheld material medical information with a causal connection to his current injury and that, under *McCorpen v. Cent. Gulf S.S. Corp.*, 396 F.2d 547 (5th Cir. 1968), this concealment excuses Candy Fleet from its maintenance and cure obligation.

---

[40]   *Id.* at 21.
[41]   *Id.* at 24-25
[42]   R. Doc. 23 at 1.
[43]   R. Doc. 23-2 at 1.
[44]   R. Doc. 19-3.

## II.    LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence."  *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008).  All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."  *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *see also Little*, 37 F.3d at 1075.  "No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  *EEOC v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014).

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would entitle it to a directed verdict if the evidence went

8

uncontroverted at trial." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991).  The nonmoving party can then defeat the motion by either countering with evidence sufficient to demonstrate the existence of a genuine dispute of material fact, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim.  *See Celotex*, 477 U.S. at 325.  The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists.  *See id.* at 324.  The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial.  *See, e.g., id.*; *Little*, 37 F.3d at 1075 ("Rule 56 *mandates* the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." (quoting *Celotex*, 477 U.S. at 322)).

9

## III.  DISCUSSION

Seamen have a right to maintenance and cure for injuries that they suffer in the course of their service on a vessel, regardless of whether the shipowner was at fault or the vessel was unseaworthy.  *See O'Donnell v. Great Lakes Dredge & Dock Co.*, 318 U.S. 36, 41-42 (1943). "Maintenance" is the right of a seaman to food and lodging if he becomes injured during the course of fulfilling his duties to the ship.  *See Atl. Sounding Co. v. Townsend*, 557 U.S. 404, 413 (2009). "Cure" is the right to necessary medical services. *Id.*  Before a plaintiff can recover maintenance and cure, he bears the burden of alleging and proving the following facts: (a) his engagement as a seaman; (b) that his illness or injury occurred, was aggravated, or manifested itself while in the ship's service; (c) the wages to which he may be entitled; and (d) the expenditures or liability incurred by him for medicines, nursing care, board, and lodging.  *See Foster v. Brian's Trans. Serv., et al.*, 1993 WL 114528, at *2 (E.D. La. 1993) (citing Martin Norris, 2 *The Law of Seamen* § 26.21 at 53 (Supp. 1992)).

Maintenance and cure may be awarded "even where the seaman has suffered from an illness pre-existing his employment."  *McCorpen v. Cent. Gulf S.S. Corp.*, 396 F.2d at 548.  Yet, there is a "general principle that it will be denied where he knowingly or fraudulently conceals his illness from the

shipowner." *Id.*; *see also Bodden v. Prof'l Divers of New Orleans, Inc.*, 2001 WL 1223589, at *2 (E.D. La. 2001) (discussing *McCorpen* defense). Specifically, if the shipowner requires a prospective seaman to undergo a pre-hiring medical evaluation, and the seaman either intentionally misrepresents or conceals material medical facts, then the seaman is not entitled to an award of maintenance and cure. *See McCorpen*, 396 F.2d at 549. For a shipowner or employer to rely on the *McCorpen* defense to deny a seaman's maintenance and cure claim, the employer must establish: (1) that the seaman has intentionally misrepresented or concealed medical facts; (2) the misrepresented or concealed facts were material to the employer's hiring decision; and (3) there exists a causal link between the pre-existing disability that was concealed and the disability suffered during the voyage. *Id*; s*ee also Brown v. Parker Offshore Drilling*, 410 F.3d 166, 171 (5th Cir. 2005) (finding *McCorpen* defense established). Here, the Court finds that Candy Fleet has established each element of its defense under *McCorpen*.

### i.    Intent to Conceal

As noted above, Kidd completed a pre-employment medical questionnaire before he was hired by Candy Fleet. On the questionnaire, Kidd was asked: (1) "Have you ever had injury or disease to your. . . Chest or Lungs?"; (2) "Have you ever had or experienced . . . Respiratory Diseases?";

11

(3) "Have you ever been a patient in a hospital?"; and (4) "Have you ever sustained any type of disability, injury, or disease?"[45] Kidd answered "no" to each of these questions.[46]

Discovery in this case reveals that all of the above declarations were untrue. Kidd maintains that the detailed description of his childhood asthma diagnosis in the Providence Hospital records is a mistake. But even taking Kidd at his word, it remains undisputed that Kidd sought emergency room care for breathing problems on two separate occasions. He was, therefore, indisputably a patient in a hospital. He was also, on both occasions, diagnosed with a disease or injury and prescribed medication as treatment. Furthermore, the notation in the Springhill records that Kidd had experienced similar issues for several years, which Kidd does not dispute, suggests that these visits were not isolated incidents.

Critically, the Fifth Circuit has held that "the 'intentional concealment' element does not require a finding of subjective intent." *Brown*, 410 F.3d at 174. Rather, "[f]ailure to disclose medical information in an interview or questionnaire that is obviously designed to elicit such information [] satisfies the 'intentional concealment' requirement." *Id.* Intentional concealment can

---

[45]   R. Doc. 19-4 at 3-4.
[46]   *Id.*

thus be established as a matter of law. *Id.* Because Candy Fleet has demonstrated that Kidd withheld pertinent medical information requested as part of its application process, Candy Fleet has satisfied the first prong of its *McCorpen* defense.

### ii. Materiality

If an employer asks a specific medical question on an application, and the inquiry is rationally related to the applicant's physical ability to perform his job duties, the information is material for the purpose of the *McCorpen* analysis. *Id.* at 175. Here, Candy Fleet's medical questions were both specific and rationally related to Kidd's position as a deckhand. Candy Fleet has therefore satisfied that materiality prong.

### iii. Causal Link

Under the causal relationship prong, the present injury need not be identical to a previous injury. "All that is required is a causal link between the pre-existing disability that was concealed and the disability incurred during the voyage." *Brown,* 410 F.3d at 176 (quoting *Quiming v. Int'l Pac. Enters., Ltd.*, 773 F. Supp. 230, 236 (D. Haw. 1990)). The test applied is "not a causation analysis in the ordinary sense." *Johnson v. Cenac Towing, Inc.*, 599 F. Supp. 2d 721, 728 (E.D. La. 2009). Rather, "the *McCorpen* defense will succeed if the defendant can prove that the old injury and the new injury

affected the same body part." *Id.* (citing *Brown*, 410 F.3d at 176); s*ee also Weatherford v. Nabors Offshore Corp.*, No. 03-0478, 2004 WL 414948, at *3 (E.D. La. Mar. 3, 2004).   In this case, the causal link between Kidd's injuries is clear.   His primary symptoms, shortness of breath and trouble breathing, are identical in 2009, 2010, and today. Even if his 2010 illness exhibited a psychological component, the disease or injury in all three cases plainly *affected* Kidd's chest and lungs.   Candy Fleet has therefore met the causal link prong.


### IV.   CONCLUSION

Candy Fleet has demonstrated that there exists no genuine dispute as to any fact material to the three prongs of its *McCorpen* defense.   Candy Fleet's motion for partial summary judgment as to claims for maintenance and cure is therefore GRANTED.


New Orleans, Louisiana, this __23rd__ day of November, 2016.


SARAH S. VANCE
UNITED STATES DISTRICT JUDGE


14