UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

DERMORIS KIDD                                    CIVIL ACTION

VERSUS                                            NO. 16-71

CANDY FLEET, LLC                            SECTION "R" (3)

## ORDER AND REASONS

Defendant Candy Fleet, LLC moves to exclude the proposed testimony of plaintiff Dermoris Kidd's expert witness Dr. Arch Carson. In support of its motion, Candy Fleet argues that Kidd has failed to meet his burden to show that Dr. Carson's opinions are reliable under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Alternatively, Candy Fleet maintains that Kidd has failed to properly disclose Dr. Carson's opinions under Federal Rule of Civil Procedure 26.  Because the Court finds that Dr. Carson's proposed testimony is unreliable under Rule 702 and *Daubert*, the Court grants Candy Fleet's motion.

# I.    BACKGROUND

## A. Injury

Plaintiff Dermoris Kidd began working as a deckhand for defendant Candy Fleet, LLC in March, 2014.[1]  On November 1, 2014 Kidd was working aboard one of Candy Fleet's vessels, the M/V CANDY STRIPE, under Captain Josiah Boudreaux.[2]   Boudreaux assigned Kidd the task of cleaning the CANDY STRIPE's engine room using Aluma Brite, a cleaning solvent.[3] Boudreaux helped clean the engine room for a period of time, and then left Kidd, who continued cleaning on his own.[4]  After several hours in the engine room, Kidd reported to Boudreaux that he felt ill.[5]

The following day, Kidd visited Urgent Care of Morgan City in Morgan City, Louisiana.[6]   A doctor at Urgent Care diagnosed Kidd with (1) "Respiratory Conditions due to Fumes and Vapors," (2) Asthma, and (3) Asthma with "Acute Exacerbation."[7]  Following treatment, Kidd was cleared to "return to work with no restrictions."[8]

---

[1]    R. Doc. 23-1 at 5.
[2]    *Id.* at 1.
[3]    *Id.* at 2.
[4]    *Id.*
[5]    *Id.* at 3.
[6]    *Id.*; R. Doc. 19-5 at 21.
[7]    R. Doc. 19-5 at 22.
[8]    *Id.* at 23.

On February 19, 2015, approximately three months after the Aluma Brite incident, Kidd was working on the M/V CANDY MACHINE, another Candy Fleet vessel.[9]   Kidd alleges that, shortly after accidentally inhaling diesel fumes produced by the vessel's engine, he was instructed to pull a rope.[10]   According to Kidd, he began pulling the rope, but quickly felt weak and unable to breathe.[11]   The following day, Kidd was treated at Teche Regional Medical Center, diagnosed with bronchospasm and bronchitis, and prescribed albuterol, prednisone, and zithromax.[12]   Two days later, Kidd was admitted as a patient at the Emergency Department of Providence Hospital in Mobile, Alabama.[13]   Kidd was diagnosed with Asthma and Expiratory Wheezing, and advised to continue taking albuterol and zithromax.[14]

Following his treatment at Teche Regional and Providence, Candy Fleet referred Kidd to Dr. William Schulte, a pulmonologist.[15]   In his initial report, Dr. Schulte stated:

> I am not sure what is going on, whether he has asthma or not. The inhalation injury does not sound severe enough to have caused this problem. I cannot explain the difficulty with the rope this far out from the inhalation injury without problems in

---

[9]      R. Doc. 23-1 at 3.
[10]     R. Doc. 23-4 at 50.
[11]     *Id.*
[12]     R. Doc. 19-5 at 29.
[13]     R. Doc. 19-7 at 20-25
[14]     *Id.* at 21-22.
[15]     R. Doc. 23-1 at 4.

3

between. The nocturnal coughing could be asthma. I have told
him I am not sure whether he has reflux or asthma or both.[16]

On May 6, 2015, Dr. Schulte stated that he felt Kidd had achieved maximum

medical improvement and did not need any further treatment.[17]

Sometime after receiving this diagnosis from Dr. Schulte, Kidd visited

Dr. John Hamilton, a practitioner in the field of occupational medicine.[18]

Dr. Hamilton disagreed with Schulte's diagnoses, and instead diagnosed

Kidd with reactive airway dysfunction syndrome (RADS), a form of chronic

asthma caused by Kidd's exposure to Aluma Brite.[19]

On January 7, 2016, Kidd filed this suit.[20] In his Jones Act complaint,

Kidd alleges negligence, unseaworthiness, wrongful denial of maintenance

and cure, and wrongful termination.[21]  Kidd seeks damages for bodily injury

and disfigurement, pain and suffering, and medical expenses.[22]  Candy Fleet

disputes that exposure to Aluma Brite caused Kidd's symptoms, and alleges

that Kidd concealed a history of lung problems—including a childhood

diagnosis of Asthma—when he applied to work for Candy Fleet.

---

[16]   R. Doc. 19-6 at 8.
[17]   *Id.* at 23.
[18]   R. Doc. 23-3 at 2.
[19]   *Id.* at 4,8.
[20]   R. Doc. 2.
[21]   *Id.* at 4-5.
[22]   *Id.* at 6.

## B. Opinion of Dr. Arch Carson

Two days after Dr. Schulte stated that Kidd had achieved maximum medical improvement, Kidd met with Dr. Arch Carson.[23]  Dr. Carson is a licensed physician, a board certified medical toxicologist, and an Assistant Professor of Occupational Medicine and Environmental Sciences at the University of Texas School of Public Health.[24]  On May 14, 2015, Dr. Carson sent Kidd a letter memorializing their meeting.[25]

In the letter, Dr. Carson summarizes Kidd's description of his own medical history and the Aluma Brite incident.  The letter states, in part:

> You were in good health until this past winter, when you were told to clean the engine room. . . . You said that you worked [with Aluma Brite] for a period of 6-7 hours in an unventilated enclosed space with no respiratory protection.  You began almost immediately to experience symptoms of throat and eye irritation and you eventually had to leave the area due to shortness of breath and chest tightness.[26]

Dr. Carson goes on to describe Kidd's self-reported symptoms, and, based on this history, provides a "provisional[]" diagnosis:

> Given Your [sic] exposure to AlumaBrite, your past and recent medical history and symptom presentation, we have provisionally given you the diagnosis chemical irritant induced

---

[23]   R. Doc. 28-4 at 1.
[24]   R. Doc. 28-5 at 1
[25]   R. Doc. 28-4 at 1-2.
[26]   *Id.* at 1.

5

asthma, although this diagnosis must be confirmed by laboratory testing and response to appropriate treatment.[27]

Dr. Carson states that "[i]f the provisional diagnosis is correct" he expects Kidd's symptoms to gradually improve over time.[28] Finally, Dr. Carson notes that he "need[s] to obtain [Kidd's] medical records from pre-exposure physicals as well as urgent care, emergency department, and pulmonology visits."[29]

Kidd has designated Dr. Carson as a "non-retained" expert witness.[30] In his disclosure to Candy Fleet, Kidd states that Dr. Carson is expected to testify that:

> Mr. Kidd experienced significant physical injuries, impairments, pain, emotional distress and other physical and financial damages and to testify regarding past and future medical treatment and reasonable and necessary medical expenses as a result of the injuries he sustained on the job.[31]

The disclosure also notes that Dr. Carson's letter memorializing his meeting with Kidd has previously been produced to Candy Fleet.[32]

Candy Fleet now moves to exclude Dr. Carson's proposed testimony on two grounds.  First, Candy Fleet argues that Kidd has failed to meet his

---

[27]   *Id.* at 2 (emphasis omitted).
[28]   *Id.*
[29]   *Id.*
[30]   R. Doc. 32-2 at 7.
[31]   *Id.*
[32]   *Id.*

6

burden to show that Dr. Carson's opinions are reliable under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).  Second, Candy Fleet maintains that, because Dr. Carson intends to testify regarding causation, he is required to produce an expert report in accordance with Federal Rule of Civil Procedure 26(a)(2)(B)—and that Dr. Carson's failure to do so is grounds for exclusion.  Finally, Candy Fleet argues that even if Dr. Carson is held only to the disclosure standard of Rule 26(a)(2)(C), the May 14 letter is inadequate and exclusion is appropriate.

In response, Kidd argues that, as a treating physician, Dr. Carson is held to the lower standard of 26(a)(2)(C) and that the May 14 letter satisfies this limited obligation.  Kidd does not address Candy Fleet's argument that Dr. Carson's testimony is unreliable.

The Court need not reach the question of which Rule 26 disclosure regime applies to Dr. Carson's proposed testimony.  The Court finds that the proposed testimony is unreliable under Rule 702 and *Daubert*, and must therefore be excluded regardless of whether Dr. Carson is a "retained" or "non-retained" expert.

## II.   LEGAL STANDARD

When expert testimony offered by one party is subject to a *Daubert* challenge, the Court must act as a "gatekeeper" under Federal Rule of Evidence 702.   A district court has considerable discretion to admit or exclude expert testimony under Rule 702.   *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 138-39 (1997); *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 371 (5th Cir. 2000).   Rule 702, which governs the admissibility of expert witness testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court held that Rule 702 requires the district court to act as a gatekeeper to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable."   509 U.S. at 589; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (clarifying that the *Daubert* gatekeeping function applies to all forms of expert testimony).   The Court's

gatekeeping function thus involves a two-part inquiry into reliability and relevance.

First, the Court must determine whether the proffered expert testimony is reliable. The party offering the testimony bears the burden of establishing its reliability by a preponderance of the evidence. *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998). The reliability inquiry requires the Court to assess whether the reasoning or methodology underlying the expert's testimony is valid. *See Daubert*, 509 U.S. at 592-93. The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation. *See id.* at 590.

The Court in *Daubert* articulated a flexible, non-exhaustive, five-factor test to assess the reliability of an expert's methodology: (1) whether the expert's theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community. *Id.* at 593-95. The Supreme Court has emphasized, however, that these factors "do not constitute a 'definitive checklist or test.'" *Kumho*, 526 U.S. at 150 (quoting *Daubert*, 509 U.S. at 593). Rather, district courts "must have

considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* at 152. Courts have also considered whether experts are "proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying," *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995), whether the expert has adequately accounted for obvious alternative explanations, *see Claar v. Burlington N.R.R.*, 29 F.3d 499 (9th Cir. 1994), and whether the expert "is being as careful as he would be in his regular professional work outside his paid litigation consulting," *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997).

Expert testimony "must be reliable at each and every step or else it is inadmissible.  The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, *et alia*." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007) (citation omitted).  "Where the expert's opinion is based on insufficient information, the analysis is unreliable." *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009).

In *Joiner*, the Supreme Court explained that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."  522 U.S. at 146.  Rather, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.*; *see also LeBlanc v. Chevron USA, Inc.*, 396 F. App'x 94, 98 (5th Cir. 2010).

If the Court is satisfied that the expert's testimony is reliable, the Court must then determine whether the expert's analysis is relevant.  The question here is whether the reasoning or methodology "fits" the facts of the case and will thereby assist the trier of fact to understand the evidence. *See Daubert*, 509 U.S. at 591.  "[F]undamentally unsupported" opinions "offer[] no expert assistance to the [trier of fact]" and should be excluded. *Guile v. United States*, 422 F.3d 221, 227 (5th Cir. 2005) (citing *Viterbo*, 826 F.2d at 422).

## III.   DISCUSSION

As noted, the parties devote the bulk of their briefing to whether Dr. Carson, as a treating physician, is excused from the disclosure requirements of Federal Rule of Civil Procedure 26(a)(2)(B).  But while the distinction between treating physicians and retained experts is material to disclosure, it

is irrelevant to determining reliability under Rule 702. "Treating physicians are no different than any other expert for purposes of Rule 702; before proffering expert testimony, they must withstand *Daubert* scrutiny like everyone else." *Tajonera v. Black Elk Energy Offshore Operations, L.L.C.*, No. 13-0550, 2016 WL 3180776, at *7 (E.D. La. June 7, 2016) (quoting *Higgins v. Koch Dev. Corp.*, 794 F.3d 697, 704 (7th Cir. 2015)); *see also Seymore v. Penn Mar. Inc.*, 281 F. App'x 300, 301 (5th Cir. 2008) (applying *Daubert* analysis to treating physician); *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244-245 (5th Cir. 2002) (same).

When treating physicians are offered to testify regarding the cause of the plaintiff's injuries, courts demand evidence that the physician has considered and excluded other potential causes. *See Harvey v. Novartis Pharm. Corp.*, 895 F. Supp. 2d 1206, 1213 (N.D. Ala. 2012) (excluding treating physician's testimony as to cause of plaintiff's illness where physician "never offered a principled reason for ruling out" alternative causes); *Deutsch v. Novartis Pharm. Corp.*, 768 F. Supp. 2d 420, 473 (E.D.N.Y. 2011) (excluding physician that did not perform an "independent differential diagnosis."). For instance, in *Higgins v. Koch Dev. Corp.*, 794 F.3d 697 (7th Cir. 2015), the Seventh Circuit considered allegations similar to those in this case: the plaintiff, Higgins, alleged he developed RADS after

a one-time exposure to harmful chemicals at an amusement park.  Higgins offered his treating physician, Dr. Haacke, as an expert on the issue of causation.  *Id.* at 705.  The court found that "Dr. Haacke essentially diagnosed Higgins after listening to his own description of his symptoms and the events at Holiday World . . . and after looking at the results (though not the underlying data) of the pulmonary function study conducted by another doctor. . . ."  *Id.*  Furthermore, the court found that Higgins made no showing that Dr. Haacke had "systematically 'rule[d] in' and 'rule[d] out' potential causes in arriving at her ultimate conclusion."  *Id.*  On this record, the appellate court concluded "that it was well within the district court's discretion to deem Dr. Haacke unqualified to proffer expert testimony."  *Id.*

Here Kidd's effort falls short of even Higgins' inadequate showing.  Unlike Dr. Haacke, who both met with her patient and reviewed a pulmonary function study, Dr. Carson appears to have arrived at his diagnosis of "chemical irritant induced asthma" without the benefit of performing or reviewing a single medical test.[33]  As with Dr. Haacke, there is no evidence that Dr. Carson considered—much less excluded—other potential causes of Kidd's symptoms.  On this record, the Court cannot conclude that Dr.

---

[33]    R. Doc. 32-3 at 2.

Carson's "testimony is based on sufficient facts or data" to survive the *Daubert* inquiry.

Supporting this conclusion is the fact that Dr. Carson himself appears to agree that his diagnosis is not ready for primetime.  In his May 14 letter, Dr. Carson states: "we have *provisionally* given you the diagnosis" of chemical induced asthma.[34]  He quickly qualifies that "this diagnosis must be confirmed by laboratory testing and response to appropriate treatment."[35] Dr. Carson further notes that "*[i]f the provisional diagnosis is correct*, we expect gradual symptom improvement over time . . . ."[36]  Finally, Dr. Carson expresses a "need to obtain [Kidd's] medical records from pre-exposure physicals as well as urgent care, emergency department, and pulmonology visits," presumably to facilitate reaching a final, non-provisional diagnosis.[37]

Kidd provides no evidence that any of these tests and record-reviews, which Dr. Carson admits are required for a reliable diagnosis, were ever performed.  And even if Dr. Carson has since taken the necessary steps to arrive at a more robust opinion,[38] Kidd's failure to disclose these additional

---

[34]    *Id.* (emphasis added).

[35]    *Id.*

[36]    *Id.* (emphasis added).

[37]    *Id.*

[38]    The evidence before the Court suggests this is unlikely. In Kidd's deposition testimony, taken approximately one year after Dr. Carson's letter, Kidd suggests that he has not returned to see Dr. Carson.  R. Doc. 31-3 at 56

bases for Dr. Carson's opinion runs afoul of even Rule 26(a)(2)(C)'s limited requirements.  *See* Fed. R. Civ. P. (a)(2)(C) (requiring disclosure of "a summary of *the facts* and opinions to which the witness is expected to testify." (emphasis added)).

Finally, to the extent Kidd intends to offer Dr. Carson's testimony as to Kidd's injuries, impairments, damages, or medical expenses the Court finds that these opinions must be excluded as well.  First, any such opinion would be grounded in Dr. Carson's unreliable diagnosis, and therefore unreliable by extension.  Second, the May 14 letter provides no summary of any opinions on these topics, and Kidd has therefore failed to meet his disclosure obligation under either Rule 26(a)(2)(B) or (C).

---

("Q. And it looks like you only treated with Dr Carson on one occasion. Was there any reason for that or?     A. Well, because -- well, because at that time uhmm, some of my family members had just moved here -- no, excuse me -- had just moved there and I was going to stay with them for a while. Q. Okay.      A. Because they needed help. So somebody else went in my place, so, you know, I didn't have no reason, but to come on back.")

## IV.   CONCLUSION

For the forgoing reasons, the Court grants Candy Fleet, LLC's motion to exclude the testimony of Dr. Arch Carson.

New Orleans, Louisiana, this __23rd__ day of November, 2016.

_Sarah Vance_

SARAH S. VANCE
UNITED STATES DISTRICT JUDGE