UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

DERMORIS KIDD                                         CIVIL ACTION

VERSUS                                                      NO. 16-71

CANDY FLEET, LLC                               SECTION "R" (3)

## ORDER AND REASONS

Defendant Candy Fleet, LLC moves to exclude the proposed testimony of plaintiff Dermoris Kidd's expert witness Dr. John Hamilton. Candy Fleet argues that Kidd has failed to meet his burden to show that Dr. Hamilton's opinions are reliable under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). The Court finds that Kidd has met his burden under *Daubert*, and Candy Fleet's motion is therefore denied.

## I.   BACKGROUND

### A. Injury

Plaintiff Dermoris Kidd began working as a deckhand for defendant Candy Fleet, LLC in March, 2014.[1]  On November 1, 2014 Kidd was working

---

[1]      R. Doc. 23-1 at 5.

aboard one of Candy Fleet's vessels, the M/V CANDY STRIPE, under Captain Josiah Boudreaux.[2]   Boudreaux assigned Kidd the task of cleaning the CANDY STRIPE's engine room using Aluma Brite, a cleaning solvent.[3] Boudreaux helped clean the engine room for a period of time, and then left Kidd, who continued cleaning on his own.[4]  After several hours in the engine room, Kidd reported to Boudreaux that he felt ill.[5]

The following day, Kidd visited Urgent Care of Morgan City in Morgan City, Louisiana.[6]   A doctor at Urgent Care diagnosed Kidd with (1) "Respiratory Conditions due to Fumes and Vapors," (2) Asthma, and (3) Asthma with "Acute Exacerbation."[7]  Following treatment, Kidd was cleared to "return to work with no restrictions."[8]

On February 19, 2015, approximately three months after the Aluma Brite incident, Kidd was working on the M/V CANDY MACHINE, another Candy Fleet vessel.[9]   Kidd alleges that, shortly after accidentally inhaling diesel fumes produced by the vessel's engine, he was instructed to pull a

---

[2]     *Id.* at 1.
[3]     *Id.* at 2.
[4]     *Id.*
[5]     *Id.* at 3.
[6]     *Id.*; R. Doc. 19-5 at 21.
[7]     R. Doc. 19-5 at 22.
[8]     *Id.* at 23.
[9]     R. Doc. 23-1 at 3.

rope.[10]  According to Kidd, he began pulling the rope, but quickly felt weak and unable to breathe.[11]   The following day, Kidd was treated at Teche Regional Medical Center, diagnosed with bronchospasm and bronchitis, and prescribed albuterol, prednisone, and zithromax.[12] Two days later, Kidd was admitted as a patient at the Emergency Department of Providence Hospital in Mobile, Alabama.[13]   Kidd was diagnosed with Asthma and Expiratory Wheezing, and advised to continue taking albuterol and zithromax.[14]

Following his treatment at Teche Regional and Providence, Candy Fleet referred Kidd to Dr. William Schulte, a pulmonologist.[15]  In his initial report, Dr. Schulte stated:

> I am not sure what is going on, whether he has asthma or not. The inhalation injury does not sound severe enough to have caused this problem. I cannot explain the difficulty with the rope this far out from the inhalation injury without problems in between. The nocturnal coughing could be asthma. I have told him I am not sure whether he has reflux or asthma or both.[16]

On May 6, 2015, Dr. Schulte stated that he felt Kidd had achieved maximum medical improvement and did not need any further treatment.[17]

---

[10]     R. Doc. 23-4 at 50.
[11]     *Id.*
[12]     R. Doc. 19-5 at 29.
[13]     R. Doc. 19-7 at 20-25
[14]     *Id.* at 21-22.
[15]     R. Doc. 23-1 at 4.
[16]     R. Doc. 19-6 at 8.
[17]     *Id.* at 23.

Sometime after receiving this diagnosis from Dr. Schulte, Kidd visited Dr. John Hamilton, a practitioner in the field of occupational medicine.[18] Dr. Hamilton disagreed with Schulte's diagnoses, and instead diagnosed Kidd with reactive airway dysfunction syndrome (RADS), a form of chronic asthma caused by Kidd's exposure to Aluma Brite.[19]

On January 7, 2016, Kidd filed this suit.[20] In his Jones Act complaint, Kidd alleges negligence, unseaworthiness, wrongful denial of maintenance and cure, and wrongful termination.[21]  Kidd seeks damages for bodily injury and disfigurement, pain and suffering, and medical expenses.[22]

## B. Opinion of Dr. John Hamilton

Dr. John Hamilton serves as Medical Director at Infirmary Occupational Health, PC in Mobile, Alabama.[23]  Dr. Hamilton has 21 years of experience as a full-time occupational medicine physician, and is board certified in the fields of internal medicine, preventative medicine and occupational medicine.[24]  Dr. Hamilton attended medical school at the University of Mississippi, completed a residency and fellowship at the Mayo

---

[18]     R. Doc. 23-3 at 2.
[19]     *Id.* at 4,8.
[20]     R. Doc. 2.
[21]     *Id.* at 4-5.
[22]     *Id.* at 6.
[23]     R. Doc. 31-5 at 2.
[24]     *Id.* at 3; R. Doc. 31-2 at 2.

Clinic in Minneapolis, and earned a masters degree in Public Health, with an emphasis in Environmental and Occupational Health, from the University of Minnesota.[25]

As noted, Dr. Hamilton treated Kidd for the respiratory distress at the center of the this lawsuit.  Dr. Hamilton diagnosed Kidd with reactive airways dysfunction syndrome (RADS) or irritant induced asthma caused by Kidd's exposure to Aluma Brite on the CANDY STRIPE.[26]  Kidd has designated Dr. Hamilton as a "non-retained" expert,  and has indicated that Dr. Hamilton will testify:

> that Mr. Kidd experienced significant physical injuries, impairments, pain, emotional distress, and other physical and financial damages and to testify regarding past and future medical treatment and reasonable and necessary medical expenses as a result of the injuries he sustained on the job.[27]

Candy Fleet now moves to exclude Dr. Hamilton's testimony as unreliable under Rule 702 and *Daubert.*

## II.   LEGAL STANDARD

When expert testimony offered by one party is subject to a *Daubert* challenge, the Court must act as a "gatekeeper" under Federal Rule of

---

[25]   R. Doc. 31-5 at 2.
[26]   R. Doc. 31-2 at 8.
[27]   R. Doc. 32-2 at 7-8.

Evidence 702.   A district court has considerable discretion to admit or exclude expert testimony under Rule 702.  *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 138-39 (1997); *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 371 (5th Cir. 2000).  Rule 702, which governs the admissibility of expert witness testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court held that Rule 702 requires the district court to act as a gatekeeper to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable."  509 U.S. at 589; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (clarifying that the *Daubert* gatekeeping function applies to all forms of expert testimony).  The Court's gatekeeping function thus involves a two-part inquiry into reliability and relevance.

First, the Court must determine whether the proffered expert testimony is reliable.  The party offering the testimony bears the burden of establishing its reliability by a preponderance of the evidence.  *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).  The reliability inquiry requires the Court to assess whether the reasoning or methodology underlying the expert's testimony is valid.  *See Daubert*, 509 U.S. at 592-93.  The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation.  *See id.* at 590.

The Court in *Daubert* articulated a flexible, non-exhaustive, five-factor test to assess the reliability of an expert's methodology: (1) whether the expert's theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community.  *Id.* at 593-95.  The Supreme Court has emphasized, however, that these factors "do not constitute a 'definitive checklist or test.'"  *Kumho*, 526 U.S. at 150 (quoting *Daubert*, 509 U.S. at 593).  Rather, district courts "must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."  *Id.* at 152.

7

Courts have also considered whether experts are "proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying," *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995), whether the expert has adequately accounted for obvious alternative explanations, *see Claar v. Burlington N.R.R.*, 29 F.3d 499 (9th Cir. 1994), and whether the expert "is being as careful as he would be in his regular professional work outside his paid litigation consulting," *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997).

Expert testimony "must be reliable at each and every step or else it is inadmissible.  The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, *et alia.*"  *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007) (citation omitted).  "Where the expert's opinion is based on insufficient information, the analysis is unreliable."  *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009).

In *Joiner*, the Supreme Court explained that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit

opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." 522 U.S. at 146. Rather, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.*; *see also LeBlanc v. Chevron USA, Inc.*, 396 F. App'x 94, 98 (5th Cir. 2010).

If the Court is satisfied that the expert's testimony is reliable, the Court must then determine whether the expert's analysis is relevant. The question here is whether the reasoning or methodology "fits" the facts of the case and will thereby assist the trier of fact to understand the evidence. *See Daubert*, 509 U.S. at 591. "[F]undamentally unsupported" opinions "offer[] no expert assistance to the [trier of fact]" and should be excluded. *Guile v. United States*, 422 F.3d 221, 227 (5th Cir. 2005) (citing *Viterbo*, 826 F.2d at 422).

## III. DISCUSSION

Candy Fleet argues that Dr. Hamilton's proposed testimony must be excluded for four reasons: (1) Dr. Hamilton is incorrect in asserting that a Diffusing Capacity of the Lungs for Carbon Monoxide (DLCO) test can be used to diagnose RADS; (2) Dr. Hamilton has never treated another patient for an Aluma Brite inhalation injury and is not qualified to opine on causation in this case; (3) Dr. Hamilton did not consider Kidd's alleged

9

history of asthma, acid reflux, and smoking; and (4) errors in Dr. Hamilton's records undermine his opinion.  The Court considers these arguments in turn.

### i.   Dr. Hamilton's Reliance on the DLCO test

Candy Stripe argues that Dr. Hamilton's diagnosis is unreliable because he relies on the results of a DLCO test to diagnose Kidd with RADS and that method is not supported by scientific literature.  A DLCO test "measures the ability of the lungs to transfer gas from inhaled air to the red blood cells in pulmonary capillaries."[28] In support of its argument, Candy Fleet points to a letter from its own expert, Dr. Schulte, in which he states that "diffusing capacity is not a diagnostic criteria for Reactive Airway Dysfunction Syndrome."[29]  Candy Fleet also calls attention to the entry on RADS from UpToDate, a physician's reference guide that Dr. Hamilton refers

---

[28]     R. Doc. 29-3 at 28.

[29]     R. Doc. 29-3 at 26.  Kidd argues that Candy Fleet's contact with Dr. Schulte violated doctor-patient privilege. Specifically, Kidd alleges that this contact "violates Louisiana law," and Kidd cites only Louisiana state court opinions in support of its argument. R. Doc. 31 at 6-7.  In this Jones Act case, however, the Court applies federal admiralty law. *See, e.g., Moragne v. States Marine Lines, Inc.*, 398 U.S. 375 (1970). "[T]here is no doctor-patient privilege under federal law." *United States v. Moore*, 970 F.2d 48, 50 (5th Cir. 1992); *see also Reid v. Moore-McCormack Lines, Inc.*, 49 F.R.D. 91, 93 (S.D.N.Y. 1970) (finding "no suggestion that admiralty law recognizes a physician-patient privilege").  Kidd's attempt to invoke Louisiana doctor-patient privilege therefore fails.

to in his deposition testimony.[30]  Candy Fleet maintains that the UpToDate entry undermines Dr. Hamilton's testimony because it does not list DLCO as a diagnostic criteria for RADS.

Candy Fleet plainly misstates the evidence when it asserts that Dr. Hamilton relied on the DLCO test as the "sole basis" for his opinion that exposure to Aluma Brite caused Kidd to develop RADS or irritant induced asthma.  In fact, Dr. Hamilton testified that, in diagnosing Kidd: "I used the whole conglomeration of everything, you know, all my years of medical experience, my interview with him, my review of all those medical records."[31] Specifically—in addition to the DLCO tests, the patient interview, and his own experience—Dr. Hamilton relied on pulmonary function tests, chest x-rays, and Kidd's response to steroid treatment.[32]  Candy Fleet presents no evidence or authority suggesting that this collection of sources is inadequate to support a diagnosis by a treating physician.   On the contrary, the UpToDate entry on RADS lists pulmonary function tests and chest imaging as relevant to diagnosing the condition.[33]  The entry further states that a diagnosis of RADS is based on: (1) "[a] history of acute exposure to an irritant

---

[30]    *Id.* at 38-47; R. Doc. 31-2 at 6.
[31]    R. Doc. 31-2 at 21.
[32]    *Id.* at 5.
[33]    R. Doc. 29-3 at 42-43.

agent or material preceding the onset of respiratory symptoms"; (2) "[a]cute onset of respiratory symptoms within 24 hours of the exposure, or within seven days at the latest"; and (3) "[p]ersistance of airway obstruction and/or hyperresponsiveness, generally for three months or more."[34]   In his testimony, Dr. Hamilton clearly indicates his belief that Kidd's symptoms following exposure to Aluma Brite conform to this trifecta of diagnostic criteria.[35]  UpToDate therefore appears to generally support Dr. Hamilton's approach.  Furthermore, Candy Fleet's argument is undermined by Fifth Circuit precedent upholding admission of expert treating physician testimony grounded in a similar diagnostic process.  *See Seymore v. Penn Mar. Inc.*, 281 F. App'x 300, 301 (5th Cir. 2008) (upholding admission of treating physician expert whose opinions "were based on his experience, training, and examination of [the plaintiff], as well as [the expert]'s evaluation of objective tests performed on [the plaintiff]").

---

[34]    *Id.* at 43.

[35]    R. Doc. 31-2 at 7 ("The printout that they have, which I also brought, on reactive airways dysfunction syndrome and irritant induced asthma I can give you guys for your record, but it -- it – it describes in a classic manner what happened with Dermoris. You know, they're several case studies in there on patients that are exposed to chlorine and other types of irritant gasses, and the description of the symptoms and the symptomatology, the timeline, all matches Dermoris' medical history, and it's a classic presentation for reactive airways dysfunction syndrome or irritant induced asthma.")

Regarding DLCO, Dr. Hamilton does once mention Kidd's low DLCO result as "consistent with the diagnosis" of RADS or irritant induced asthma.[36]  However, in every other mention of diffusion capacity or DLCO in the deposition transcript, Dr. Hamilton refers to the test to either (1) support the hypothesis that Kidd's lungs are impaired,[37] or (2) exclude asthma or other potential competing diagnoses as a cause of Kidd's symptoms.[38]  Both of these uses of DLCO results are supported by the UpToDate database.[39] The Court therefore cannot find on the record before it that the UpToDate

---

[36]     *Id.* at 5.

[37]     *See Id.* at 6 ("[T]he DLCO measures your oxygen exchange capacity at the alveolar level, and normally the diffusion level of carbon monoxide should be significantly higher than this, and that's consistent with a moderately severe interstitial type lung disease."); *Id.* at 7 ("[Kidd's DLCO result] is 55 percent, which is a moderate decrease, which is just above the level we would call totally and permanently disabled. So it indicates that he has significant damage to his lung.").

[38] *See* R. Doc. 31-2 at 20 ("Usually asthmatics have an increased DLCO. So I don't think what we are dealing with here is just plain old asthma, you know. That key point makes you think that there is a different diagnosis, because asthma has a high DLCO and we are dealing with Dermoris has a low DLCO"); *Id.* ("anxiety wouldn't affect his DLCO either"); *Id.* at 30 ("It is possible it's an exacerbation of his preexisting condition, but I think it's very unlikely given the fact that the DLCO is 55 percent predicted, which you would not expect with asthma."); *Id.* at 32 ("Q. You mentioned the DLCO or the diffusion level of carbon monoxide. How does that help form that particular opinion?  A. With asthma, the DLCO is typically elevated. In this case, the DLCO is decreased.").

[39]     *See* R. Doc. 29-3 at 33 ("[S]evere respiratory impairment is defined as a DLCO below 45 percent of the predicted value"); *Id.* at 29 ("Patients with airway obstruction from asthma typically have normal or high DLCO values.").

entries provided by Candy Fleet support a finding that Dr. Hamilton's testimony is unreliable under Rule 702 and *Daubert*.

Finally, the Court acknowledges that Dr. Schulte, Candy Fleet's expert disagrees with Dr. Hamilton's diagnosis.  But this disagreement alone is not enough exclude Dr. Hamilton's opinions.  As the Fifth Circuit has emphasized:

> When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the amendment on "sufficient facts or data" is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.

*Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 249 (5th Cir. 2002) (quoting Fed. R. Evid. 702 advisory committee's note); *see also id.* at 250 ("[W]hile exercising its role as a gate-keeper, a trial court must take care not to transform a *Daubert* hearing into a trial on the merits").  Other than a reference to the UpToDate entries—which, as noted, do little to undermine Dr. Hamilton's opinion—Candy Fleet simply asks the Court to take its expert's word over that of Kidd's.  But this is not the Court's role under *Daubert*.  Candy Fleet must instead rely on the "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof [that] are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

14

ii.    *Dr. Hamilton's qualifications*

Candy Fleet's second argument for exclusion concerns Dr. Hamilton's qualifications.   Candy Fleet argues that because Dr. Hamilton is not a pulmonologist, and has never treated a case of Aluma Brite inhalation before, he is unqualified to offer a causation opinion in this case.  Under *Daubert,* the Court must ensure that a proposed expert is "qualified to testify in a particular field or on a given subject." *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) (quoting *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999)). But "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue. Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Id.* (citing *Daubert*, 509 U.S. at 596).

There is no question that Dr. Hamilton's education and experience qualify him as a general medical expert.  Candy Fleet's objection is therefore best characterized as asserting that Dr. Hamilton is insufficiently specialized in a particular subfield of medicine to offer an opinion in this case.  The Fifth Circuit has cautioned, however, that "an expert witness is not strictly confined to his area of practice, but may testify concerning related applications." *United States v. Wen Chyu Liu*, 716 F.3d 159, 168-69 (5th Cir. 2013) (quoting *Wheeler v. John Deere Co.*, 935 F.2d 1090, 1100 (10th Cir.

1991)). Accordingly, "[a] lack of specialization should generally go to the weight of the evidence rather than its admissibility." *Id.* at 168.

In opposition to this principle, Candy Fleet cites *Tanner v. Westbrook*, 174 F.3d 542 (5th Cir. 1999). In that case, the Fifth Circuit reversed the trial court's decision "to admit an expert's opinion that the defendants' actions led to [a baby's developing] cerebral palsy when the medical literature did not support this theory of causation, the expert had not examined the baby, and the expert also had no personal experience that would validate his theory." *Huss v. Gayden*, 571 F.3d 442, 455 (5th Cir. 2009) (summarizing the holding of *Tanner*).  *Tanner*, however, is easily distinguishable: Candy Fleet has not presented evidence that the medical literature "does not support" Dr. Hamilton's theory of causation.   Furthermore, Dr. Hamilton, unlike the expert in *Tanner*, has personally examined the subject of his opinion. *Tanner* therefore does not support departing in this case from the general rule that experts are not confined to offering opinions within a narrowly-circumscribed specialty. *See Huss*, 571 F.3d at 456 (5th Cir. 2009) ("The court's mistaken approach restricted Dr. Carpenter's testimony based on a requirement that the witness practice a particular specialty to testify concerning certain matters." (quoting *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 782 (3d Cir. 1996)).

16

### iii.   Dr. Hamilton's alleged failure to consider other causes.

Candy Fleet's third argument for excluding Dr. Hamilton is that he allegedly failed to consider Kidd's history of asthma, smoking, and acid reflux as alternative causes of Kidd's symptoms. This argument fails for two reasons.  First, Kidd disputes that he smoked or suffered from asthma in the past.  Therefore, whether these factors should be considered at all rests on a question of fact. This Court may not "exclude an expert's testimony on the ground that the court believes one version of the facts and not the other." *Pipitone*, 288 F.3d at 249 (quoting Fed. R. Evid. 702 advisory committee's note).   Second, and more important, Dr. Hamilton offers reasoned justifications for discounting each of these competing causes in his deposition.  As noted, Dr. Hamilton maintains that Kidd's low DLCO score diminishes the likelihood that Kidd's symptoms are caused by asthma.[40]  Dr. Hamilton also concludes that smoking is an unlikely cause based on Kidd's age, and that severe acid reflux leading to respiratory symptoms is not typical in patients that, like Kidd, are not significantly overweight.[41]  Candy Fleet provides no argument or authority suggesting that these conclusions are

---

[40]   R. Doc. 31-2 at 20.
[41]   *Id.* at 18, 20.

unreliable.   To the extent Candy Fleet feels they are misguided, it may challenge Dr. Hamilton's conclusions through cross examination.

### iv.   Errors in Dr. Hamilton's records

Finally, Candy Fleet asserts that errors in Dr. Hamilton's medical records undermine Dr. Hamilton's reliability and support excluding his proposed testimony.   Candy Fleet did not, however, attach these records to its motion, and the Court is therefore forced to glean the effect of these errors secondhand from Dr. Hamilton's deposition.   The deposition suggests that on three separate record entries, Dr. Hamilton and another doctor at his practice marked Kidd as approved for either "restricted duty" or "regular duty."[42]   When asked about these notations, Dr. Hamilton stated that they were "typographical error[s]," caused by either mistakes in entering electronic records or transcription errors by Dr. Hamilton's secretary.[43] Candy Fleet offers no authority suggesting that such errors justify exclusion under *Daubert*, nor any reasons why these mistakes undermine Dr. Hamilton's ability to reliably diagnose Kidd's ailments. The Court therefore finds that these errors are fodder for cross examination, rather than grounds for exclusion.

---

[42]   R. Doc. 31-2 at 27.
[43]   *Id.*

18

## IV.   CONCLUSION

For the forgoing reasons, Candy Fleet, LLC's motion to exclude the testimony of Dr. John Hamilton is DENIED.

New Orleans, Louisiana, this __29th__ day of November, 2016.

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE

19